## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. _____

WILLIAM H. CLAFLIN, IV; JOSEPHINE C. HORAN;
PATRICIA M. CLAFLIN; EDWARD A. CLAFLIN;
ELAINE Y. ALEXANDER; JOHN K. SPRING, JR.;
HELEN S. MONTERO; WILLIAM C. SPRING;  SUSAN
K. SPRING; DAVID G. WITTER; MALCOLM G.
WITTER; DEAN WITTER III; HELEN C. WITTER;
KATHARINE C. WEEKS; KATHARINE W. WHITE;
MARTHA W. SINCLAIR; JOHN W. WEEKS JR.;
DAVID C. WEEKS; SINCLAIR WEEKS; STEPHEN D.
WEEKS; ROBERT F. WEEKS; ESTATE OF ANNE C.
ALLEN; ESTATE OF HELEN C. SPRING; ESTATE OF
JOHN W. WEEKS; and ESTATE OF PRENTICE W.
CLAFLIN

Plaintiffs,

v.

LAFARGEHOLCIM LTD; INVERSIONES
IBERSUIZAS S.A.; HOLCIM TRADING SA (F/K/A)
UNION MARITIMA INTERNACIONAL SA; DE
RUITER OUDERLANDE B.V.; LAS PAILAS DE
CEMENTO S.A.U.; and UNKNOWN SUBSIDIARY OF
THE LAFARGEHOLCIM GROUP,

Defendants.

## **COMPLAINT**

Plaintiffs, William H. Claflin, IV; Josephine C. Horan; Patricia M. Claflin; Edward A.

Claflin; Elaine Y. Alexander; John K. Spring Jr.; Helen S. Montero; William C. Spring; Susan K.

Spring; David G. Witter; Malcolm G. Witter; Dean Witter III; Helen C. Witter; Katharine C.

Weeks; Katharine W. White; Martha W. Sinclair; John W. Weeks Jr.; David C. Weeks; Sinclair

Weeks; Stephen D. Weeks; Robert F. Weeks; Estate of Anne C. Allen; Estate of Helen C. Spring; Estate of John W. Weeks; and Estate of Prentice W. Claflin (collectively, "Plaintiffs"), for their Complaint against LafargeHolcim Ltd ("LafargeHolcim"); Inversiones Ibersuizas S.A. ("Ibersuizas"); Holcim Trading SA (f/k/a Union Maritima Internacional SA ("UMAR")); De Ruiter Ouderlande B.V. ("De Ruiter"); Las Pailas De Cemento S.A.U. ("Las Pailas"); and an Unknown Subsidiary of the LafargeHolcim Group ("Unknown Subsidiary") allege as follows:

## PRELIMINARY STATEMENT

1.    Plaintiffs bring this action to recover treble damages, interest, costs, and attorneys' fees under the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996, codified at 22 U.S.C. § 6021, *et seq.* (the "Helms-Burton Act") against Defendants LafargeHolcim, De Ruiter, Las Pailas, and the Unknown Subsidiary for trafficking in property which was confiscated by the Cuban Government on or after January 1, 1959 and as to which Plaintiffs own 100% of the claims as certified by the Foreign Claims Settlement Commission ("FCSC").

2.    The FCSC Final Decision, which is attached hereto as Exhibit 1, certified the total loss of Compania Azucarera Soledad, S.A. ("Soledad"), including all its assets (less its liabilities), which was confiscated by the Cuban Government on August 6, 1960 and listed as nationalized in Resolution No. 1 (pursuant to Law No. 851), published in the Cuban Official Gazette on August 6, 1960 ("Confiscated Soledad Property").

3.    Soledad was a prosperous closely held family-owned corporation that the Cuban government confiscated in 1960 without compensating Soledad's owners, U.S. nationals Helen A. Claflin; William H. Claflin; III, Mary C. Rentschler; Anne C. Allen; and John W. Weeks (collectively, "Claimants").

4.     Soledad's expansive and successful operations near Cienfuegos, Cuba, included a sugar mill with all necessary facilities, large sugar cane fields, and extensive pasture land in the Province of Las Villas, Cuba.  Soledad's land-holdings included 27,170.98 acres, which included various natural resources, such as limestone. and which were conveniently located near the deep-water port of Cienfuegos, and were traversed by two rivers, one of which was navigable, furnishing water transportation to Cienfuegos.  In addition, Soledad owned 31 miles of narrow-gauge railroad with steam locomotives.

5.     On October 16, 1964, Congress enacted Title V of the International Claims Settlement Act of 1949 ("ICSA"), Pub. L. 88-666, 78 Stat. 1110 (1964) (codified at 22 U.S.C. §§ 1643–1643k (1964)), establishing the Cuba Claims Program, which was administered by the FCSC.

6.     The FCSC is a quasi-judicial, independent agency within the U.S. Department of Justice that adjudicates claims of U.S. nationals against foreign governments, under specific jurisdiction conferred by Congress.

7.     Under ICSA and the Cuba Claims Program, the FCSC "receive[d] evidence and determine[d] the amount and validity of claims by nationals of the United States against the Government of Cuba … for losses resulting from the nationalization, expropriation, intervention, or other taking of, or special measures directed against, property including any rights or interests therein owned wholly or partially, directly or indirectly at the time by nationals of the United States."  22 U.S.C. § 1643b(a).

8.     On October 8, 1969, the FCSC certified in Final Decision No. CU-3836 on FCSC Claim Nos. CU-1393, CU-1394, CU-1395, CU-1396 and CU-1397 *In the Matter of the Claim of Helen A. Claflin, William H. Claflin, III, Mary C. Rentschler, Anne C. Allen, and John W. Weeks*

3

the total loss of Claimants in the amount of $11,686,342.59 "with interest at 6% per annum from August 6, 1960 to the date of settlement." ("FCSC Certified Claims"). Exh. 1.

9.      The full amount of the FCSC Certified Claims remain uncompensated and unsettled and Cuba continues to exploit, benefit from, and use the property it confiscated from the Claimants in 1960.

10.     Cuba converted the Confiscated Soledad Property into the Carlos Marx cement plant, which utilizes and benefits from the Confiscated Soledad Property, including its rivers, railroads, limestone, and other infrastructure.

11.     Defendants used a complex web of shell entities and transactions designed, until very recently, to conceal the fact that LafargeHolcim has partially owned and operated and profited from the Carlos Marx cement plant in partnership with the Cuban government since 2000.

12.     Plaintiffs, who now own the FCSC Certified Claims to the Confiscated Soledad Property, seek treble money damages, interest, costs, and attorneys' fees against certain Defendants for trafficking in the Confiscated Soledad Property as defined by the Helms-Burton Act.

13.     In 1996, the U.S. Congress passed the Helms-Burton Act, and President Clinton signed the Act into law on March 12, 1996.  Title III of the Act, which took effect in August 1996, imposes liability against persons who "traffic" in property confiscated by the Cuban government on or after January 1, 1959, the claims to which are owned by U.S. nationals.

14.     The Helms-Burton Act explicitly states that FCSC certified claims must be accepted as conclusive proof of a plaintiff's ownership of property.

4

15.     The Helms-Burton Act also explicitly states that the loss calculation set forth in an FCSC certified claim plus interest is the presumptive base damages amount to be trebled. It also states that the presumption may be rebutted by clear and convincing evidence that the liability is instead the greater of the value as may be determined by a court-appointed special master, or by the current fair market value of the confiscated property.

16.     The clear and convincing evidence demonstrates that the current fair market value of the Confiscated Soledad Property is greater than the amount of the FCSC Certified Claims plus interest.  Therefore, Plaintiffs are entitled to recover the current fair market value of the property, which is estimated to be $270 million, plus attorneys' fees, interest, and costs.

17.     Because the FCSC certified Claimants' claims to the Confiscated Soledad Property, Defendants are subject to treble damages (including interest), in an amount in excess of $810 million, plus attorneys' fees, interest, and costs.

18.     Although Title III's creation of liability as to those engaged in trafficking has remained in force since August 1996, the ability of any potential plaintiff to bring a private right of action under Title III had been suspended by the President  (pursuant to authority granted in the Act) until May 2019, when President Donald Trump allowed the suspension of Title III's private right of action to lapse, thereby allowing such actions to proceed.

19.     Therefore, LafargeHolcim, De Ruiter, Las Pailas, Inversion Apollo 200 S.L. (a/k/a Alianza De Proyectos 200 SL), and the Unknown Subsidiary knew that trafficking in the Confiscated Soledad Property, *e.g.*, by using, benefitting, or profiting, directly or indirectly in or from the Confiscated Soledad Property without authorization of the U.S. nationals who own the claims to that property carried the risk of liability under the Helms-Burton Act.  Indeed, the

FCSC Certified Claims originally belonging to Claimants (and now to Plaintiffs) have been publicly available since their issuance in 1969.

20.     In fact, in 2000, prior to LafargeHolcim's (then known as Holderbank) investment in Cuba, LafargeHolcim sought legal advice from a U.S. law firm about the effect of the Helms-Burton Act and the FCSC Certified Claims on its then potential investment in, modernization of, and management of the Carlos Marx cement plant.  LafargeHolcim's U.S. law firm advised that investing in the cement plant without obtaining the authorization of the persons holding the FCSC Certified Claims would subject it to liability under the Helms-Burton Act.  The U.S. law firm also advised LafargeHolcim that LafargeHolcim should not try to conceal its trafficking through the use of various corporate structures, for any such attempted concealment would not avoid said liability.

21.     Contrary to its U.S. law firm's advice, LafargeHolcim proceeded to traffic, knowingly and intentionally, in the Confiscated Soledad Property by affiliating with, using, and conspiring with the other Defendants to create and maintain a complex web of corporate structures, shell companies, and alliances designed to conceal, until recently, LafargeHolcim's investment in and trafficking in the Confiscated Soledad Property.

22.     Since 2000, LafargeHolcim has trafficked, knowingly and intentionally, in the Confiscated Soledad Property, seemingly confident that it would not be held accountable for its trafficking in any U.S. court.  But LafargeHolcim has purposefully availed itself and sought the protection of the U.S. legal system, even as it took active steps to evade that system, including by filing a civil complaint in federal court and admitting on the record in that lawsuit that it, *i.e.,* Defendant LafargeHolcim Ltd, which is based in Switzerland: (a) has extensive business operations in the United States, (b) is the United States' leading cement producer, (c) offers

6

waste management services in numerous cities throughout the United States, (d) recovers and recycles waste through co-processing at service locations across North America, and (e) has reached a significant number of consumers in the United States.

23.     Now that they are permitted to pursue a private right of action under the Helms-Burton Act, Plaintiffs seek long-overdue relief for the uncompensated use and exploitation of the Confiscated Soledad Property to which Plaintiffs own 100% of the claims, all of which are FCSC-certified.

## JURISDICTION AND VENUE

24.     The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically Title III of the Helms-Burton Act, 22 U.S.C. §§ 6081–85.

25.     In addition, the Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1367(a) because Plaintiffs' conspiracy claim is "so related" to their Helms-Burton Act claims that it "form[s] part of the same case or controversy under Article III of the United States Constitution."

26.     The amount in controversy in this action exceeds $50,000, exclusive of compounded interest, treble damages, court costs, and reasonable attorneys' fees. 22 U.S.C. § 6082(b).

27.     Personal jurisdiction is conferred upon this Court over all Defendants by Federal Rule of Civil Procedure 4(k)(1)(A) and Fla. Stat. § 48.193(1)(a)(2) because the Defendants would be subject to personal jurisdiction in the state court of Florida, the state in which this District Court is located.   Specifically, as alleged herein (*see infra*, ¶¶ 127 – 188 and 172-178), Defendants, through certain of their corporate officers and/or directors, engaged in a conspiracy,

and overt acts in furtherance of that conspiracy were committed within Florida by one or more of the co-conspirators, including LafargeHolcim and UMAR.

28.    In the alternative to personal jurisdiction as alleged in paragraph 27, to the extent LafargeHolcim is not subject to jurisdiction in any state, personal jurisdiction is conferred upon this Court over LafargeHolcim by Federal Rule of Civil Procedure 4(k)(2), because Plaintiffs' Helms-Burton Act claims arise under federal law; LafargeHolcim is not subject to jurisdiction in any state's courts of general jurisdiction; and exercising jurisdiction over LafargeHolcim based on its nationwide contacts is consistent with the U.S. Constitution and laws.  Exercise of personal jurisdiction by this Court over LafargeHolcim is also consistent with the U.S. Constitution and U.S. laws because this action arises from or relates to LafargeHolcim's activities in Florida or the United States, and LafargeHolcim purposefully availed itself of the benefits and protections of Florida or the United States.

29.    In addition, in the alternative to personal jurisdiction alleged in paragraph 27, to the extent all Defendants are not subject to jurisdiction in any state, personal jurisdiction is conferred upon this Court over all Defendants by Federal Rule of Civil Procedure 4(k)(2), because Plaintiffs' Helms-Burton Act claims arise under federal law; Defendants are not subject to jurisdiction in any state's courts of general jurisdiction; and exercising jurisdiction over the Defendants for their conduct purposefully directed at the United States is consistent with the U.S. Constitution and laws. The exercise of personal jurisdiction by this Court over Defendants is consistent with the U.S. Constitution and U.S. laws because Defendants committed intentional torts purposefully directed at U.S. nationals in the United States which caused harm that Defendants knew or reasonably should have anticipated would be suffered in the United States by certain U.S. nationals.

8

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a "substantial part of the events or omissions giving rise to the claims occurred" in this District.

31.     In the alternative, venue also is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because at least one Defendant is subject to the Court's personal jurisdiction with respect to this action.

32.     Contemporaneous with this filing, Plaintiffs have paid the special fee for filing an action under Title III of the Helms-Burton Act, 22 U.S.C. § 6082(i), which is $6,548 pursuant to the fee schedule adopted by the Judicial Conference in September 2018.

## PARTIES AND RELEVANT NON-PARTIES

33.     Plaintiff William H. Claflin, IV, a natural person residing in Jamaica Plain, Massachusetts, has been a United States citizen his entire life.

34.     Plaintiff Josephine C. Horan, a natural person residing in East Thetford, Vermont, has been a United States citizen her entire life.

35.     Plaintiff Patricia M. Claflin, a natural person residing in Nantucket, Massachusetts, has been a United States citizen her entire life.

36.     Plaintiff Edward A. Claflin, a natural person residing in Los Angeles, California, has been a United States citizen his entire life.

37.     Plaintiff Elaine Y. Alexander, a natural person residing in Mount Washington, Massachusetts, has been a United States citizen her entire life.

38.     Plaintiff John K. Spring Jr., a natural person residing in Naples, Florida, has been a United States citizen his entire life.

39.     Plaintiff Helen S. Montero, a natural person residing in Belmont, Massachusetts, has been a United States citizen her entire life.

40.     Plaintiff William C. Spring, a natural person residing in Concord, Massachusetts, has been a United States citizen his entire life.

41.     Plaintiff Susan K. Spring, a natural person residing in Nantucket, Massachusetts, has been a United States citizen her entire life.

42.     Plaintiff David G. Witter, a natural person residing in Ocala, Florida, has been a United States citizen his entire life.

43.     Plaintiff Malcolm G. Witter, a natural person residing in Palm Springs, California, has been a United States citizen his entire life.

44.     Plaintiff Dean Witter III, a natural person residing in Woodside, California, has been a United States citizen his entire life.

45.     Plaintiff Helen C. Witter, a natural person residing in Mercer Island, Washington, has been a United States citizen her entire life.

46.     Plaintiff Katharine C. Weeks, a natural person, residing in Belmont, Massachusetts, has been a United States citizen her entire life.

47.     Plaintiff Katharine W. White, a natural person residing in Vineyard Haven, Massachusetts, has been a United States citizen her entire life.

48.     Plaintiff Martha W. Sinclair, a natural person residing in Damariscotta, Maine, has been a United States citizen her entire life.

49.     Plaintiff John W. Weeks, Jr., a natural person residing in Marblehead, Massachusetts, has been a United States citizen his entire life.

50.     Plaintiff David C. Weeks, a natural person residing in Ellicott City, Maryland, has been a United States citizen his entire life.

51.      Plaintiff Sinclair Weeks, a natural person residing in Belmont, Massachusetts, has been a United States citizen his entire life.

52.      Plaintiff Stephen D. Weeks, a natural person residing in Naples, Florida, has been a United States citizen his entire life.

53.      Plaintiff Robert F. Weeks, a natural person residing in Arlington, Massachusetts, has been a United States citizen his entire life.

54.      Plaintiff Estate of Anne C. Allen, deceased, is represented through its Executor William H. Claflin, IV.  Anne C. Allen was a natural person residing in Concord, Massachusetts, and was a United States citizen her entire life.

55.      Plaintiff Estate of Estate of Helen C. Spring, deceased, is represented through its Executor William Spring.   Helen C. Spring was a natural person residing in Concord, Massachusetts, and was a United States citizen her entire life.

56.      Plaintiff Estate of John W. Weeks, deceased, is represented through its Executor Stephen D. Weeks.  John W. Weeks was a natural person residing in Belmont, Massachusetts, and was a United States citizen his entire life.

57.      Plaintiff Estate of Prentice W. Claflin, deceased, is represented through its Executor, Edwin M. Claflin.  Prentice W. Claflin was a natural person residing in Nantucket, Massachusetts, and was a United States citizen his entire life.

58.      Defendant LafargeHolcim is a corporation organized and existing under the laws of Switzerland, with its principal place of business at Zürcherstrasse 156, Jona, SG, 8645 Switzerland.

59.      LafargeHolcim resulted from a merger in 2014 of Lafarge S.A. and Holcim Ltd. ("Holcim").  Prior to 2001, Holcim was known as Holderbank.

60.     LafargeHolcim is a global integrated services company, with operations in 80 countries, including the United States.  It operates on the basis of at least 1500 patents and patent applications and provides services under patent and trade secret protection in each locality in which it operates.

61.     As a services provider, LafargeHolcim uses proprietary U.S. Government-protected intellectual property to provide services throughout the United States in at least 43 of the 50 states.

62.     LafargeHolcim touts on its website:  "No region is untouched by our distribution network in the US" (https://www.lafargeholcim.us/where-we-are) and "LafargeHolcim's capabilities reach across all regions with the US." *Id.*

63.     In addition, "LafargeHolcim is one of the world's largest providers of construction materials, and is the leading cement producer in the United States."  Complaint and Demand for Jury Trial, *LafargeHolcim Ltd v. Carbon Geocycle, Inc.*, Civil No. 19-cv-265-F (Dec. 20, 2019, D. Wyo.).

64.     In its Complaint in *Carbon Geocycle, Inc.*, *supra*, LafargeHolcim touts that LafargeHolcim's waste recycling services (a) "are available in numerous cities throughout the United States … [;]" (b) "[i]n 2018 … reduced the amount of waste going to U.S. landfills by approximately 1.7 million tons …[;]" and (c) have "reached a significant number of consumers in the United States." *Id.*

65.     In addition to LafargeHolcim's foregoing U.S. business operations, LafargeHolcim, through approximately 200 U.S. subsidiaries, operates in 43 states, including:

(a) 13 plants that produce more than 22 million tons of cement every year;

(b) a far-reaching manufacturing and distribution network for moving cement and cement-related products to customers throughout the United States;

(c) nearly 130 terminals spanning the breadth of the United States; and

(d) 121 ready-mixed sites, 28 hot mix asphalt sites, 98 aggregate sites, and 18 aggregate                                                                                       docks,

66.      In 2019, LafargeHolcim's global net sales were in excess of CHF 27 billion ($30 billion USD), on which LafargeHolcim reaped an operating profit of CHF 3.8 billion ($4.1 billion USD).  https://www.lafargeholcim.com/key-financials.

67.      In 2018, LafargeHolcim reported that more than 18.64% of its worldwide sales occurred in North America, the last year for which full data is available.  *See* LafargeHolcim Ltd Half-Year 2019 Report, Condensed Consolidated Statement of Income at 8-9.

68.      The overwhelming majority of LafargeHolcim's North American sales occur in the United States.  For example, in 2012, the last year for which separate U.S. sales data was available, LafargeHolcim, reported that the United States accounted for about 17 percent of LafargeHolcim's worldwide sales.

69.      Since 2000, LafargeHolcim and its predecessors have issued securities that are sold in Florida pursuant to prospectuses.

70.      Defendant Ibersuizas is a corporation organized under the laws of Spain.

71.      Defendant UMAR is a corporation organized under the laws of Spain and a wholly owned subsidiary of LafargeHolcim. In 2000, UMAR was a wholly owned subsidiary of Holderbank (which became Holcim and is now LafargeHolcim). In 2000, UMAR's CEO was Joaquin Villanueva. From approximately 1997 until 2002, UMAR had an office in in Florida. One of UMAR's officers/directors was Markus Akermann, who was a member of the Executive Committee of Holcim (then known as Holderbank) from 1993-2002. In 2002, Akermann became

CEO of Holcim. UMAR is currently listed as "inactive" on Florida's Division of Corporations website.

72.     Defendant De Ruiter is a shell corporation organized under the laws of The Netherlands.

73.     Defendant Las Pailas is a corporation organized under the laws of Spain.

74.     Defendant Unknown Subsidiary is a subsidiary of the LafargeHolcim Group. Because its identity is unknown to Plaintiffs at this time, it is also unknown to Plaintiffs where and how it is organized.

75.     Non-party Cementos Cienfuegos S.A. ("Cementos Cienfuegos") is a joint venture organized under the laws of Cuba, with its principal place of business in Cienfuegos, Cuba. Cementos Cienfuegos operates the Carlos Marx cement plant located on the Confiscated Soledad Property.

76.     Non-party Inversion Apollo 200 S.L. (A/K/A Alianza De Proyectos 200 SL) was a corporation organized under the law of Spain.

## STATUTORY BACKGROUND

I.     **The U.S. Foreign Claims Settlement Commission**

77.     On October 16, 1964, Congress enacted Title V of the ICSA establishing the Cuba Claims Program administered by the FCSC.

78.     Under ICSA and the Cuba Claims Program, the FCSC "receive[d] and determine[d] in accordance with applicable substantive law, including international law, the amount and validity of claims by nationals of the United States against the Government of Cuba. . . for losses resulting from the nationalization, expropriation, intervention, or other taking of, or special measures directed against . . property including any rights or interests therein owned

wholly or partially, directly or indirectly at the time by nationals of the United States." 22 U.S.C. § 1643b(a) (emphases added).

79.     The FCSC then "certif[ied] to each individual who has filed a claim . . . the amount determined by the Commission to be the loss or damage suffered by the claimant. The [FCSC] shall certify to the Secretary of State such amount and the basic information underlying that amount, together with a statement of the evidence relied upon and the reasoning employed in reaching its decision." 22 U.S.C. § 1643f(a).

80.     Although it was originally contemplated that the Secretary of State would use these certified claims in a settlement agreement with Cuba, such agreement has not to date come to pass. Congress passed the Helms-Burton Act in 1996, which contains special provisions for those who own FCSC certified claims.

## II.     The Helms-Burton Act

### A.     Background

81.     The Helms-Burton Act, signed into law on March 12, 1996, had several goals, including to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime," 22 U.S.C. § 6022(6).    Further, Congress determined that "'trafficking' in confiscated property provides badly needed financial benefit, including hard currency, oil, and productive investment and expertise to the … Cuban government and thus undermines the foreign policy of the United States," which foreign policy includes "protect[ing] claims of United States nationals who had property wrongfully confiscated by the Cuban government." 22 U.S.C. § 6081(6).

82.     Congress found that international law "lacks fully effective remedies" for the "unjust enrichment from the use of wrongfully confiscated property by governments and private entities at the expense of the rightful owners of the property." 22 U.S.C. § 6081(8).

83.     Congress thus decided that "the victims of these confiscations should be endowed with a judicial remedy in the courts of the United States that would deny traffickers any profits from economically exploiting Castro's wrongful seizures." 22 U.S.C. § 6081(11).

84.     The result was Title III of the Helms-Burton Act – "Protection of Property Rights of United States Nationals" – which imposes liability on persons trafficking in property confiscated from a U.S. national by the Cuban government on or after January 1, 1959, and which authorizes a private right of action for damages against such traffickers.  *See* 22 U.S.C. § 6082.

85.     The Helms-Burton Act authorizes the President (or his delegate, the Secretary of State) to suspend for periods of up to six months at a time (1) the Title III private right of action, 22 U.S.C. § 6085(c); and/or (2) the effective date of Title III of August 1, 1996, 22 U.S.C. § 6085(b).

86.     Although President Clinton suspended the private right of action under Title III on July 16, 1996 for six months, he did not suspend the effective date and Title III  came into effect on August 1, 1996. Starting on that date, traffickers of confiscated property were liable to U.S. nationals with certified claims to that property even though they could not yet be sued while the private right of action remained suspended.

87.     President Clinton and subsequent administrations renewed the suspension of the Title III private right of action, for a maximum of six months at a time, by decision of the President and Secretary of State.  The suspension of the private right of action was renewed at

least every six months but there was never any guarantee  future suspensions. The operative provisions of the Act, including liability for traffickers under Title III, have remained in effect at all times since 1996.

88.     On May 2, 2019, Secretary of State Pompeo lifted the suspension of Title III's private right of action, thus finally allowing lawsuits under the Helms-Burton Act to proceed.

**B.     The Helms-Burton Act's Private Right of Action**

89.     Title III of the Helms-Burton Act provides the following private right of action:

(1) Liability for trafficking.—(A) Except as otherwise provided in this section, any person that, after the end of the 3-month period beginning on the effective date of this title, traffics in property which was confiscated by the Cuban Government on or after January 1, 1959, shall be liable to any United States national who owns the claim to such property for money damages . . . .

22 U.S.C. § 6082(a)(1).

90.     The Act defines "person" as "any person or entity, including any agency or instrumentality of a foreign state." 22 U.S.C. § 6023(11).

91.     The Act defines "United States national" to include "any United States citizen[.]" 22 U.S.C. § 6023(15).

92.     A person "traffics" in confiscated property if that person "knowingly and intentionally":

(i)  sells, transfers, distributes, dispenses, brokers, manages, or otherwise disposes of confiscated property, or purchases, leases, receives, possesses, obtains control of, manages, uses, or otherwise acquires or holds an interest in confiscated property,

(ii) engages in a commercial activity using or otherwise benefiting from confiscated property, or

(iii) causes, directs, participates in, or profits from, trafficking (as described in clause (i) or (ii) by another person, or otherwise engages in trafficking (as described in clause (i) or (ii)) through another person, without the authorization of any United States national who holds a claim to the property.

22 U.S.C. § 6023(13).

93.     The Act defines "property" as "any property (including patents, copyrights, trademarks, and any other form of intellectual property), whether real, personal, or mixed, and any present, future, or contingent right, security, or other interest therein, including any leasehold interest." 22 U.S.C. § 6023(12).

94.     The Act defines "confiscated" in relevant part as "the nationalization, expropriation, or other seizure by the Cuban government of ownership or control of property, on or after January 1, 1959—(i) without the property having been returned or adequate and effective compensation provided; or (ii) without the claim to the property having been settled pursuant to an international claims settlement agreement or other mutually accepted settlement procedure." 22 U.S.C. § 6023(4)(A).

95.     The term "knowingly" under the Act means "with knowledge or having reason to know."  22 U.S.C. § 6023(9).

96.     The Helms-Burton Act adopts the definition of "commercial activity" under 28 U.S.C. § 1603(d), *see* 22 U.S.C. § 6023(3), which defines the term as "either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).

**C.     Remedies Under the Helms-Burton Act's Private Right of Action**

97.     A person who "traffics" in a U.S.  national's confiscated property under the Helms-Burton Act is liable to a plaintiff for money damages equal to:

(i)      the amount which is the greater of—

(I)     the amount, if any, certified to the claimant by the [FCSC] under the [ICSA], plus interest;

(II)    the amount determined [by a court-appointed special master, which may include the FCSC], plus interest; or

(III)   the fair market value of that property, calculated as being either the current value of the property, or the value of the property when confiscated plus interest, whichever is greater[.]

22 U.S.C. § 6082(a)(1)(A).

98.     Interest under the Act accrues from "the date of confiscation of the property involved to the date on which the action is brought."  22 U.S.C. § 6082(a)(1)(B).   Interest is calculated pursuant to 28 U.S.C. § 1961 "at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System" for the calendar week preceding the date of confiscation and compounded annually. 28 U.S.C. § 1961(a) (incorporated by reference in 22 U.S.C. § 6082(a)(1)(B)).

99.     A person who "traffics" in a U.S. national's confiscated property under the Act is also liable for a plaintiff's court costs and reasonable attorneys' fees.   *See* 22 U.S.C. § 6082(a)(1)(A)(ii).

100.    The Act adopts "a presumption that the amount for which a person is liable . . . is the amount that is certified [by the FCSC under the ICSA]" plus interest and trebled.  *See* 22 U.S.C. § 6082(a)(2); § 6082(a)(1)(A)(i)(I); § 6082(a)(1)(B)); 6082(a)(3).

101.    Said presumption may be rebutted by clear and convincing evidence of a greater value, as may be determined by a court-appointed special master, or by the current fair market value.  *See* 22 U.S.C. § 6082(a)(1)(A).

102.    A court must "accept as conclusive proof of ownership of an interest in property a certification of a claim to ownership of that interest that has been made by the [FCSC under the ICSA]." 22 U.S.C. § 6083(a)(1).

103.    The Act provides that "[a]ny person that traffics in confiscated property for which liability is incurred" shall be liable for treble damages to a United States national who owns a certified claim to that property.  22 U.S.C. § 6082(a)(3)(A), (C).

<u>FACTUAL ALLEGATIONS</u>

**I.    Cuba's Confiscation of Soledad and all of Soledad's Assets**

**A.    Soledad and its Assets**

104.    Soledad was incorporated in Cuba in 1920.  Prior to August 6, 1960, the date that Cuba nationalized the Confiscated Soledad Property, Claimants, who were all members of the same family, were the sole owners of Soledad.

105.    Soledad was engaged in sugar operations, cattle raising, and dairy farming in the Province of Las Villas, Cuba.  Soledad's lands were conveniently located near the deep water port of Cienfuegos, and were traversed by two rivers, one of which was navigable, furnishing water transportation to Cienfuegos.  As discussed in the FCSC Final Decision (Exh. 1), Soledad owned and operated a sugar mill with all of the necessary infrastructure, works, facilities and extensive cane fields, and 31 miles of railway, with related locomotives, rail and freight cars, etc. leading from the fields to the sugar mill, and from the mill to the loading dock on the river.  *See* Exh. 1 at 3.

B.      **Cuba Confiscates All of Soledad's Property and Assets**

106.    In 1959, the Cuban government, under the control of Fidel Castro, promulgated a series of laws and resolutions to confiscate, without compensation, virtually all private property in Cuba owned by U.S. nationals in various economic sectors.

107.    Soledad was listed as nationalized by Cuba in Resolution No. 1 (pursuant to Law 851) published in the Cuban Official Gazette on August 6, 1960. This nationalization order resulted in the confiscation, without compensation, by the Cuban government of all of Soledad's property and assets.

108.    Since 1960, the Cuban government has used the Confiscated Soledad Property for commercial activities.

109.    Since 2000, and various times thereafter, the Cuban Government has used the Soledad Confiscated Property in a commercial joint venture with LafargeHolcim Ibersuizas, De Ruiter, Las Pailas, Inversion Apollo 200 S.L. (a/k/a Alianza De Proyectos 200 SL), and the Unknown Subsidiary.

II.     **The FCSC Certified Claimants' Claims in 1969 for More Than $11 Million**

110.    Under the Cuba Claims Program, Claimants submitted claims to the FCSC for certification regarding their confiscated property. As alleged above, at the inception of the Cuba Claims Program, the hope was that the certified claims would later be compensated under a broad Cuba-U.S. settlement agreement.  That settlement agreement has, to date, not come to pass.

21

111.    The decision on Claimants' certified claims is and has been publicly accessible since before LafargeHolcim chose to make its investment in Cuba in 2000.[1]

112.    The FCSC found that Claimants had "been nationals of the United States since birth." Exh. 1 at 3.

113.    The FCSC "certifie[d] that [Claimants] suffered a loss as a result of actions of the Government of Cuba in the amount of $11,686,342.72." Exh. 1 at 9.

114.    Claimants' claims have never been settled pursuant to a settlement agreement between the United States and Cuba.

115.    Plaintiffs own all of Claimants' claims.

**III**.    **LafargeHolcim Knowingly and Intentionally Trafficked in the Confiscated Soledad Property to which Plaintiffs Own all Claims**

**A.**    **Holderbank's (now LafargeHolcim) U.S. Counsel told Holderbank that its Proposed Investment in the Carlos Marx Cement Plant would Lead to Liability for Trafficking under the Helms-Burton Act Unless Holderbank Obtained the Requisite Authorization**

116.    In May 2015, Holcim, a Swiss-based global building materials and aggregates company, merged with the French company Lafarge S.A. to create LafargeHolcim.  Prior to a name change in May 2001, Holcim was known as Holderbank.

117.    In 1999, Ibersuizas approached Holderbank (now LafargeHolcim) about investing in Cuba's Carlos Marx cement plant.

118.    Thereafter, Holderbank (now LafargeHolcim) requested a legal opinion from its U.S. law firm ("Counsel"), regarding the risks posed under U.S. law if Holderbank [now LafargeHolcim] were to invest in the cement plant.  Indeed, Holderbank (now LafargeHolcim)

---

[1] *See* FCSC, Final Opinions and Orders, https://www.justice.gov/fcsc/cuba/documents/1-1500/1393-1394-1395-1396-1397.pdf (last visited on September 10, 2020).

knew at that time that the Carlos Marx cement plant sits on and otherwise benefits from the Confiscated Soledad Property to which U.S. nationals held claims certified by the FCSC and specifically sought U.S. legal advice because it was concerned about its liability and other ramifications under the Helms-Burton Act.

119.   In a fax sent on or around June 2000 ("Fax"), Counsel told Thomas Knöpfel, who was a member of the Executive Committee of Holderbank Financiera Glaris S.A., the parent company in the Holderbank group of companies at that time, that if Holderbank invested in the Carlos Marx cement plant without obtaining authorization of the holders of the FCSC Certified Claims, Holderbank (now LafargeHolcim) likely would be liable to those holders under Title III of the Helms-Burton Act.

120.   Thereafter, Mr. Knöpfel sent the Fax to Sr. Joaquin Villanueva, the then CEO of UMAR.

121.   As alleged above, at that time (June 2000), UMAR was a wholly owned subsidiary of Holderbank (now LafargeHolcim) and had an office in Florida and was registered to do business in Florida as a "foreign profit corporation."

122.   As alleged above, Holderbank (now LafargeHolcim) knew that the Carlos Marx cement plant sits on and otherwise benefits from the Confiscated Soledad Property to which Claimants possessed claims certified by the FCSC

123.   Counsel told Holderbank (now LafargeHolcim) that it should not attempt to invest in the Carlos Marx cement plant through a subsidiary, such as UMAR, or a trust, as a means of avoiding Title III liability.

124.   Counsel told Holderbank (now LafargeHolcim) that, in addition to Helms-Burton Act liability, Holderbank (now LafargeHolcim) would face legal exposure under Florida state

laws that regulate transactions with Cuba, particularly Florida laws mirroring some of the Helms-Burton Act provisions.

125.    After receiving the Fax with Counsel's advice from Holderbank's (now LafargeHolcim), UMAR ceased operations in Florida.  Indeed, in 2002, Florida revoked UMAR's registration for failure to file its annual report, and UMAR is presently listed as "inactive" on Florida's business website.  UMAR is, however, still an active business in Spain.

126.    Counsel told Holderbank (now LafargeHolcim) that it should not attempt to seal off its Cuba activities in a subsidiary that did not do significant business in the United States. Structuring its activities in that way, advised Counsel, would not protect Holderbank (now LafargeHolcim) from Helms-Burton liability because of the breadth of the HBA's definition of trafficking.

**B.    Holderbank (now LafargeHolcim) Conspired with Ibersuizas and UMAR and Invested in the Carlos Marx Cement Plant through a Complex Web of Shell Entities, all Controlled by Holderbank (now LafargeHolcim)**

127.    In June 2000, around the same time that Holderbank (now LafargeHolcim) received the Fax from its U.S. Counsel, Holderbank (now LafargeHolcim) knowingly and intentionally commenced the process of investing in the Carlos Marx cement plant utilizing a web of shell affiliates and structures designed to hide its involvement in the investment.

128.    Upon information and belief, to that end, various corporate officers and/or directors at Holderbank and UMAR (whose identities are unknown to Plaintiffs at this time) agreed that Holderbank's investment in Cuba should not be public because, it if were, Holderbank and UMAR  likely would face lawsuits, scrutiny, and liability under the Helms-Burton Act and Florida law as discussed in the Fax from Holderbank's Counsel.

129.    Holderbank (now LafargeHolcim) thus entered into an agreement with Ibersuizas to have Ibersuizas act as the public face of the investment. Certain corporate officers and/or directors at Holderbank, Ibersuizas, and UMAR (whose identities are unknown to Plaintiffs at this time) agreed that Holderbank and Ibersuizas both would traffic in the Confiscated Soledad Property and further agreed that the trafficking of Ibersuizas – a company with no U.S. ties or subsidiaries – would be public, while the trafficking of Holderbank – a company with U.S. ties through UMAR –  would be concealed. They also apparently agreed that Holderbank's investment would not be made through UMAR, the subsidiary with a U.S. presence at the time. The Holderbank and Ibersuizas officers and/or directors further agreed that Holderbank would, at all times, possess the controlling interest in a company to be established, Las Pailas, which shared (50/50) ownership of Cementos Cienfuegos with the Cuban government.

130.    In or around June, 2000, Ibersuizas signed a letter of intent with the Cuban government to invest in the Carlos Marx cement plant.  Upon knowledge, information and belief the letter of intent was signed by Ibersuizas' President, Juan Abello ("Abello").

131.    On June 23, 2000, the Cement Corporation, a company owned by the Cuban Government, wrote back to Abello at Ibersuizas asking for assurance that the announced Ibersuizas investment, if approved, would in fact be led by Holderbank (now LafargeHolcim).

132.    On July 11, 2000, the Cuban Ministry of Basic Industry similarly wrote to Abello at Ibersuizas, asking for assurance that the announced Ibersuizas investment was in fact being made in partnership with LafargeHolcim – the company with the actual cement experience – so the investment could go forward.

133.    In furtherance of the agreement and conspiracy alleged herein,  and with the agreement and knowledge of various corporate officers and/or directors of Holderbank, in

November 2000, Ibersuizas set up Las Pailas de Cemento S.A., (Las Pailas), a Spanish corporation, as the investment vehicle for the trafficking, and publicly announced that Ibersuizas was purchasing a 50% stake in non-party Cementos Cienfuegos, the Cuban joint venture with Las Pailas that continues today to operate the Carlos Marx cement plant.

134.    In November 2000, corporate officers and/or directors of Las Pailas (the identities of which are unknown to Plaintiffs at this time) agreed to join the conspiracy by agreeing that that Las Pailas would, and did in fact, also traffic in the Confiscated Soledad Property.

135.    To this day, Las Pailas owns the 50% foreign stake in the Cementos Cienfuegos joint venture.  Las Pailas, and all those who,  cause, direct, participate in, profit from its commercial activities with the Carlos Marx cement plant, or otherwise benefit from the Soledad Confiscated Property, including LafargeHolcim, are "trafficking" as defined in 22 U.S.C. § 6023(13).

136.    From November 2000 - May 2005, Ibersuizas (through Las Pailas) appeared publicly to be the sole foreign investor in the Carlos Marx cement plant, when in fact Holderbank (a/k/a Holcim, now known as LafargeHolcim) controlled Las Pailas, which owned 50% of the plant.

137.    In or around May 2005, Ibersuizas sold its interest in  Las Pailas to Inversion Apollo 200 S.L. for €48 million.

138.    Corporate officers and/or directors (the identities of which are unknown to Plaintiffs at this time) of Inversion Apollo 200 S.L. agreed to join the conspiracy by agreeing that Inversion Apollo 200 S.L. would, and did in fact, also traffic in the Confiscated Soledad Property.

139.    In April 2011, Inversion Apollo 200 S.L.  changed its name to Alianza de Proyectos 200 SL.

140.    By mid-2011, Alianza de Proyectos, and its nominal investors, appeared as the owner of the shell entity De Ruiter which owned Las Pailas shares and, through it, 50% of the Cuban joint venture.

141.    Corporate officers and/or directors (the identities of which are unknown to Plaintiffs at this time) of De Ruiter agreed to join the conspiracy by agreeing that De Ruiter would, and did in fact, also traffic in the Confiscated Soledad Property.

142.    UMAR was doing business in Florida throughout the time period when the investment was structured and consummated (June – November 2000), and UMAR continued to do business in Florida for approximately two years (until 2002) after LafargeHolcim closed on its investment in the Carlos Marx cement plant.

143.    In 2014, a spokesman for Holcim (formerly Holderbank, now LafargeHolcim) told a reporter for the Miami Herald that "Holcim does not own a business or a stake in a business in Cuba."

144.    In a 2018 Half-Year Report, LafargeHolcim finally publicly disclosed that it has a long-term investment in Cuba.

145.    In its 2019 Annual Report, LafargeHolcim announced that the Defendant Unknown Subsidiary has an investment in a joint venture that owns a cement plant in Cuba. The Annual Report went on to describe Title III of the Helms-Burton Act and the lapse of the waiver by the Trump Administration in May 2019, adding that, as of the date of that Annual Report, no Title III lawsuits had been filed against LafargeHolcim.

146.     Corporate officers and/or directors (the identities of which are unknown to Plaintiffs at this time) of the Unknown Subsidiary agreed to join the conspiracy by agreeing that the Unknown Subsidiary would, and did in fact, also traffic in the Confiscated Soledad Property. Thus, the Unknown Subsidiary, and all those who cause, direct, participate in, or profit from its commercial activities with the Carlos Marx cement plant, or otherwise benefit from the Soledad Confiscated Property, including LafargeHolcim, are "trafficking" as defined in 22 U.S.C. § 6023(13).

147.     Plaintiffs were injured in the United States by Defendants' trafficking in the Confiscated Soledad Property without authorization.

148.     Plaintiffs were further injured in the United States by Defendants' acts of concealment of their acts of trafficking in the Confiscated Soledad Property.

## FIRST CAUSE OF ACTION

### Trafficking in Confiscated Property Pursuant to 22 U.S.C. § 6082
### (Against LafargeHolcim)

149.     Plaintiffs incorporate by reference paragraphs 1 through 148 as though fully set forth herein.

150.     Title III of the Helms-Burton Act provides that any person who "traffics" in property which was confiscated by the Cuban government on or after January 1, 1959, shall be liable to any U.S. national who owns the claim to such property for monetary damages as specified in the Helms-Burton Act. 22 U.S.C. § 6082(a)(1).

151.     The living Plaintiffs – William H. Claflin, IV; Josephine C. Horan; Patricia M. Claflin; Edward A. Claflin; Elaine Y. Alexander; John K. Spring Jr.; Helen S. Montero; William C. Spring; Susan K. Spring; David G. Witter; Malcolm G. Witter; Dean Witter III; Helen C. Witter; Katharine C. Weeks; Katharine W. White; Martha W. Sinclair; John W. Weeks Jr.;

David C. Weeks; Sinclair Weeks; Stephen D. Weeks; and Robert F. Weeks – have been U.S. citizens since birth, and they are "United States Nationals" within the meaning of the Helms-Burton Act.  *See* 22 U.S.C. § 6023(15).

152.   The deceased Plaintiffs  – Anne C. Allen; Helen C. Spring; John W. Weeks; and Prentice W. Claflin – whose claims are being pursued by their estates, were U.S. citizens since birth, and they were "United States Nationals" within the meaning of the Helms-Burton Act.  *See* 22 U.S.C. § 6023(15).

153.    As "United States Nationals," Plaintiffs are entitled to sue "any person that . . . traffics in property which was confiscated by the Cuban government on or after January 1, 1959." 22 U.S.C. § 6082(a)(1).

154.   Plaintiffs own all claims to the Confiscated Soledad Property that was confiscated by Cuba on or after January 1, 1959.

155.   The claims to the Confiscated Soledad Property were certified by the FCSC on October 8, 1969.

156.   Plaintiffs' ownership of the FCSC Certified Claims is "conclusive proof of ownership" of their interests in the Confiscated Soledad Property.  22 U.S.C. § 6083(a)(1).

157.   The FCSC certified loss of $11,686,342.72 is the presumed amount a trafficker in the Confiscated Soledad Property owes Plaintiffs under Title III of the Helms-Burton Act, exclusive of interest, treble damages, court costs, and reasonable attorneys' fees.  *See* 22 U.S.C. § 6082(a)(2).

158.    That presumption is "rebuttable by clear and convincing evidence" that the current fair market value exceeds the certified value, plus interest.  *Id.*

29

159.    The current fair market value of the Confiscated Soledad Property is approximately $270 million.

160.    Defendant LafargeHolcim "knowingly and intentionally" trafficked in the Confiscated Soledad Property, *e.g.*, LafargeHolcim: (1) "use[d]" the Confiscated Soledad Property; (2) "engage[d] in a commercial activity using or otherwise benefiting from" the Confiscated Soledad Property; and/or (3) "cause[d], direct[ed], participate[d] in, or profit[ed] from," the trafficking described in (1) and (2) by another person, or otherwise "engage[d] in" such trafficking through another person." 22 U.S.C. § 6023(13)(A).

161.    LafargeHolcim did not at any time obtain Claimants' or Plaintiffs' authorization regarding the Confiscated Soledad Property.  *See* 22 U.S.C. § 6023(13).

162.    LafargeHolcim engaged in trafficking as that term is defined in the Helms-Burton Act after November 1, 1996, the end of the three-month grace period the Helms-Burton Act provided after it became effective on August 1, 1996. *See* 22 U.S.C. § 6082(a)(1)(A).

163.    LafargeHolcim trafficked in the Confiscated Soledad Property to which the Plaintiffs own the FCSC Certified Claims within the last two years prior to the date of filing this Complaint.  *See* 22 U.S.C. § 6084.

164.    Accordingly, Plaintiffs are entitled to damages from LafargeHolcim in an amount to be proven at trial and presently estimated to be $270 million, the current fair market value of the Confiscated Soledad Property, trebled, or approximately $810 million, plus court costs, reasonable attorneys' fees, and post-judgment interest.  See 22 U.S.C. § 6082(a)(1)(A)(i) and (ii); § 6082(a)(1 (3); 28 U.S.C. § 1961.

## SECOND CAUSE OF ACTION

**Trafficking in Confiscated Property Pursuant to 22 U.S.C. § 6082**
**(Against De Ruiter, Las Pailas, and the Unknown Subsidiary)**

165.    Plaintiffs incorporate by reference paragraphs 1 through 164 as though fully set forth herein.

166.    De Ruiter, Las Pailas, Inversion Apollo 200 S.L. (a/k/a Alianza De Proyectos 200 SL), and the Unknown Subsidiary "knowingly and intentionally" trafficked in the Confiscated Soledad Property, *e.g.*, they: (1) "use[d]" the Confiscated Soledad Property; (2) "engage[d] in a commercial activity using or otherwise benefiting from" the Confiscated Soledad Property; and/or (3) "cause[d], direct[ed], participate[d] in, or profit[ed] from," the trafficking described in (1) and (2) by another person, or otherwise "engage[d] in" such trafficking through another person. 22 U.S.C. § 6023(13)(A).

167.    De Ruiter, Las Pailas, Inversion Apollo 200 S.L. (a/k/a Alianza De Proyectos 200 SL), and the Unknown Subsidiary did not obtain Claimants' or Plaintiffs' authorization regarding the Confiscated Soledad Property.  *See* 22 U.S.C. § 6023(13).

168.    Las Pailas, De Ruiter, Inversion Apollo 200 S.L. (a/k/a Alianza De Proyectos 200 SL), and the Unknown Subsidiary engaged in trafficking as that term is defined in the Helms-Burton Act after November 1, 1996, the end of the three-month grace period the Helms-Burton Act provided after it became effective on August 1, 1996. See 22 U.S.C. § 6082(a)(1)(A).

169.    Las Pailas, De Ruiter, Inversion Apollo 200 S.L. (a/k/a Alianza De Proyectos 200 SL), and the Unknown Subsidiary trafficked in the Confiscated Soledad Property to which the Plaintiffs own and hold the FCSC Certified Claims within the last two years prior to the date of filing this Complaint.  *See* 22 U.S.C. § 6084.

170.    LafargeHolcim knew about the Claimants' FCSC Certified Claims and the Confiscated Soledad Property at all relevant times herein.  In 2000, Holderbank's (a/k/a Holcim, now LafargeHolcim) U.S. Counsel specifically informed Holderbank (a/k/a Holcim, now LafargeHolcim) that trafficking in the Confiscated Soledad Property would subject Holderbank (a/k/a Holcim, now LafargeHolcim) to liability under the Helms-Burton Act and would expose Holderbank (a/k/a Holcim, now LafargeHolcim) and its subsidiary UMAR to scrutiny and liability under Florida statutes and regulations that govern doing business in Cuba and with Cuba.

171.    Holderbank (a/k/a Holcim, now LafargeHolcim) shared that information from Holderbank's U.S. Counsel with UMAR and, upon information and belief, that information also was shared with Ibersuizas.  Various corporate officers and/or directors of Ibersuizas also therefore also knew and agreed that Ibersuizas would be trafficking in the Confiscated Soledad Property with Holderbank (a/k/a Holcim, now LafargeHolcim).

172.    Over the course of several years, Defendants – through their corporate officers and/or directors (the identities of which are unknown to Plaintiffs at this time) – agreed with each other to actively take steps, and did in fact take active steps to structure Holderbank's (a/k/a Holcim, now LafargeHolcim) investment in the Carlos Marx cement plant and use of the Confiscated Soledad Property in a manner to conceal that LafargeHolcim – an entity with U.S. connections, contacts and activities throughout the United States and including through, *inter alia*, its wholly owned subsidiary UMAR's Florida office – was involved in the investment.

173.    Specifically, in furtherance of the agreement and conspiracy to traffic in the Confiscated Soledad Property, LafargeHolcim, UMAR, and Ibersuizas, through their various corporate officers and/or directors, devised and carried out a scheme to conceal (until 2018)

LafargeHolcim's role in the trafficking by, at various times, having Defendants Ibersuizas, De Ruiter, and Inversion Apollo 200 S.L. (a/k/a Alianza de Proyectos 200 SL) appear to control Las Pailas, when in fact, at all times, LaFargeHolcim was in control of Las Pailas as alleged herein.

174.    In furtherance of the agreement and conspiracy, which was carried out by Defendants' corporate officers and/or directors, to traffic in the Confiscated Soledad Property, LafargeHolcim (then Holderbank), in or around 2000, initially intended to carry out its investment in the Carlos Marx cement plant through UMAR, its wholly-owned subsidiary which at that time was doing business in Florida.  After receiving the Fax from Counsel, however, corporate officers and/or directors of Holderbank (a/k/a Holcim, now LafargeHolcim) and UMAR decided against UMAR being used to carry out Holderbank's (a/k/a Holcim, now LafargeHolcim) investment in the Carlos Marx cement plant.  Instead corporate officers and/or directors of Ibersuizas, Holderbank, and UMAR agreed that Ibersuizas and Holderbank would, in fact did, use an elaborate corporate structure including Las Pailas, and the shell entities De Ruiter, and Apollo to conceal LafargeHolcim's involvement.

175.    In furtherance of the agreement and conspiracy to traffic in the Confiscated Soledad Property, in or around 2002, UMAR which, at all relevant times (specifically 2000 through the date of this filing), has been a wholly-owned subsidiary of Holderbank (a/k/a Holcim, now LafargeHolcim), stopped doing business in Florida and closed its Florida office.

176.    In furtherance of the agreement and conspiracy to traffic in the Confiscated Soledad Property, Holderbank (a/k/a Holcim, now LafargeHolcim), upon knowledge information and belief, during 2000 – until sometime in 2018, did not comply with Fla. Stat. § 517.075, which requires that "[a]ny issuer of securities that will be sold in this state pursuant to a

prospectus must disclose in the prospectus if the issuer or any affiliate thereof … does business with the government of Cuba or with any person or affiliate located in Cuba."

177.    As a direct result of the aforementioned overt acts taken in furtherance of the conspiracy, including the acts undertaken in Florida by UMAR and LafargeHolcim, LafargeHolcim (with other Defendants at various times) trafficked in the Confiscated Soledad Property for nearly twenty years without public knowledge or legal consequence.

178.    In 2018, LafargeHolcim finally publicly announced its investment in Cuba, thereby admitting its trafficking in the Soledad Confiscated Property.

179.    Accordingly, Plaintiffs are entitled to damages from Las Pailas, De Ruiter, and the Unknown Subsidiary in an amount to be proven at trial and presently estimated to be $270 million, the current fair market value of the Confiscated Soledad Property, trebled, or approximately $810 million, plus court costs, reasonable attorneys' fees, and post-judgment interest.  *See* 22 U.S.C. § 6082(a)(1)(A)(i) and (ii); § 6082(a)(1 (3); 28 U.S.C. § 1961.

## THIRD CAUSE OF ACTION

**Conspiracy**
**(Against All Defendants)**

180.    Plaintiffs incorporate by reference paragraphs 1 through 179 as though fully set forth herein.

181.    Each of LafargeHolcim, Ibersuizas, UMAR, De Ruiter, Las Pailas, Inversion Apollo 200 S.L. (a/k/a Alianza De Proyectos 200 SL), and the Unknown Subsidiary, agreed to "traffic" – as that term is defined in the Helms-Burton Act – in the Confiscated Soledad Property without obtaining authorization of Claimants' or Plaintiffs.

182.    Accordingly, Plaintiffs are entitled to damages from Defendants in an amount to be proven at trial and presently estimated to be $270 million, the fair market value of the

Confiscated Soledad Property, trebled, or approximately $810 million, plus court costs, reasonable attorneys' fees, and post-judgment interest.  See 22 U.S.C. § 6082(a)(1)(A)(i) and (ii); § 6082(a)(1 (3); 28 U.S.C. § 1961.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and against Defendants:

1.    Awarding Plaintiffs actual damages as provided under the Act, in the amount of the higher of:

    (a)    the current fair market value of the Confiscated Soledad Property in the amount to be proven at trial, presently estimated to be $270 million, which, because this is an FCSC certified claim is trebled pursuant to the Helms Burton Act (22 U.S.C. § 6082(a)(3)) for a total damages award of approximately $810 million, or;

    (b)    the treble of $11,686,342.59, the amount certified by the FCSC, with interest since August 6, 1960, to be proven at trial, which at the FCSC rate of interest of 6% results in a total damages award of approximately $160 million.

2.    Awarding Plaintiffs pre-judgment interest as allowed by law;

3.    Ordering Defendants to pay Plaintiffs' reasonable attorneys' fees and costs incurred in this action pursuant to 22 U.S.C. § 6082(a)(1)(A)(ii);

4.      Awarding Plaintiffs post-judgment interest pursuant to 28 U.S.C. § 1961;

5.      Granting all other relief that the Court deems just and proper.

Dated: September 11, 2020                    Respectfully submitted,

                              By:      */s/Nelson C. Bellido*
                                       Nelson C. Bellido
                                       Roig, Tutan, Rosenberg, Martin & Bellido, P.A.
                                       44 W. Flagler Street, Suite 2100
                                       Miami, Florida 33130
                                       Tel: 305-405-0997
                                       Fax: 305-405-1022
                                       Pleadings@RoigLawyers.com
                                       nbellido@roiglawyers.com

                                            - AND -

                                       David Baron (to be admitted *pro hac vice*)
                                       Melvin White (to be admitted *pro hac vice*)
                                       Dale Eppler (to be admitted *pro hac vice*)
                                       Laina C. Lopez (to be admitted *pro hac vice*)
                                       BERLINER CORCORAN & ROWE LLP
                                       1101 17th Street NW, Suite 1100
                                       Washington, D.C. 20036
                                       Tel: (202) 293-5555
                                       Fax: (202) 293-9035
                                       dbaron@bcr-dc.com
                                       mwhite@bcr-dc.com
                                       deppler@bcr-dc.com
                                       lcl@bcr-dc.com

                                       *Counsel for Plaintiffs*